IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL and ENVIRONMENTAL DEFENSE FUND,<br><br>      Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>      Defendant. | Case No. 18-cv-11227-PKC<br>ECF Case |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXPEDITE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT ............................................................................................................................... 3

    I.  EXEMPTION 5 DOES NOT APPLY TO THE OMEGA v.1.4.59 CORE MODEL ......... 3

        A. The OMEGA v.1.4.59 core model fails the first condition of Exemption 5................ 3

        B. The OMEGA v.1.4.59 core model fails the second condition of Exemption 5 ........... 5

            1. EPA has not provided sufficient detail to invoke the deliberative-process
               privilege ......................................................................................................... 5

            2. The OMEGA core model is not "deliberative." .................................................... 8

               a. The OMEGA core model does not reveal the subjective process of
                  factual selection ............................................................................................ 9

               b. The OMEGA v.1.4.59 core model is not a deliberative draft .................... 13

                  i.  The OMEGA v.1.4.59 core model is not a "draft." .............................. 13

                  ii. The OMEGA v.1.4.59 core model is not a *deliberative* draft ............. 16

            3. The OMEGA v.1.4.59 core model is not "predecisional." ................................ 19

        C. Even if Exemption 5 applies to portions of the OMEGA v.1.4.59 core model,
          EPA still is withholding agency records in violation of FOIA ................................. 21

            1. EPA has not shown foreseeable harm from disclosure of the OMEGA
               v.1.4.59 core model ...................................................................................... 21

            2. The executable package for the OMEGA core model is reasonably
               segregable from the source code.................................................................... 22

    II. EXPEDITION OF THIS CASE IS WARRANTED........................................................ 23

CONCLUSION........................................................................................................................... 24

# TABLE OF AUTHORITIES

### Cases

*Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*,
  --- F. Supp. 3d ---, 2019 WL 1380334 (S.D.N.Y. Mar. 26, 2019) ............................................ 6

*Arthur Andersen & Co. v. I.R.S.*,
  679 F.2d 254 (D.C. Cir. 1982) ........................................................................................... 16

*Bailey v. United States*,
  516 U.S. 137 (1995) ............................................................................................................. 4

*Bloomberg, L.P. v. Bd. of Gov'rs of the Fed. Reserve Sys.*,
  601 F.3d 143 (2d Cir. 2010) ................................................................................................. 5

*Brennan Ctr. for Justice v. Dep't of State*,
  300 F. Supp. 3d 540 (S.D.N.Y. 2018) ................................................................................. 3

*Brennan Ctr. for Justice v. U.S. Dep't of State*,
  300 F. Supp. 3d 540 (S.D.N.Y. 2018) ............................................................................... 23

*Center for Biological Diversity v. EPA*,
  2019 WL 1382903 (D.D.C. Mar. 27, 2019) .................................................................. 10, 17

*Cleary, Gottlieb, Steen & Hamilton v. Department of Health & Human Services*,
  844 F. Supp. 770 (D.D.C. 1993) ........................................................................................ 13

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ........................................................................................... 13

*Color of Change v. U.S. Dep't of Homeland Sec.*,
  325 F. Supp. 3d 447 (S.D.N.Y. 2018) ......................................................................... 8, 9, 16

*Dep't of the Interior v. Klamath Water Users Prot. Ass'n*,
  532 U.S. 1 (2001) ............................................................................................. 3, 4, 5, 14, 19

*Drone Techs., Inc. v. Parrot S.A.*,
  838 F.3d 1283 (Fed. Cir. 2016) .......................................................................................... 22

*Florez v. C.I.A.*,
  829 F.3d 178 (2d Cir. 2016) ....................................................................................... 5, 7, 17

*Fox News Network, LLC v. U.S. Dep't of the Treasury*,
  911 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................................ 19

*Goodrich Corp. v. EPA*,
  593 F. Supp. 2d 184 (D.D.C. 2009) .............................................................................. 11, 12

*Grand Cent. P'ship, Inc. v. Cuomo*,
   166 F.3d 473 (2d Cir. 1999)..........................................................................................8

*Judicial Watch, Inc. v. Dep't of Defense*,
   847 F.3d 735 (D.C. Cir. 2017 ....................................................................................18

*Lahr v. National Transportation Safety Board*,
   2006 WL 2854314 (C.D. Cal. Oct. 4, 2006)............................................................12

*Lead Industries Ass'n v. Occupational Safety & Health Admin.*,
   610 F.2d 70 (2d Cir. 1979)......................................................................................4, 9

*Milner v. Dep't of the Navy*,
   562 U.S. 562 (2011)................................................................................................3, 4

*Nat'l Assn of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007)..................................................................................................23

*Nat'l Council of La Raza v. Dep't of Justice*,
   411 F.3d 350 (2d Cir. 2005)..................................................................................8, 14

*Nat'l Day Laborer Org. Network v. U.S. Imm. & Customs Enf't Agency*,
   811 F. Supp. 2d 713 (S.D.N.Y. 2011)......................................................................16

*Quarles v. Department of the Navy*,
   893 F.2d 390 (D.C. Cir. 1990)....................................................................................4

*Quinon v. F.B.I.*,
   86 F.3d 1222 (D.C. Cir. 1996)....................................................................................6

*Reilly v. EPA*,
   429 F. Supp. 2d 335 (D. Mass. 2006) ......................................................................12

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
   421 U.S. 168 (1975)..................................................................................................19

*Rosenberg v. U.S. Dep't of Def.*,
   342 F. Supp. 3d 62 (D.D.C. 2018) ...........................................................................21

*Tigue v. U.S. Dep't of Justice*,
   312 F.3d 70 (2d Cir. 2002)..............................................................................5, 8, 19

*Urban Air Initiative, Inc. v. EPA*,
   271 F. Supp. 3d 241 (D.D.C. 2017) .........................................................................11

*Wilner v. Nat'l Sec. Agency*,
   592 F.3d 60 (2d Cir. 2009)..........................................................................................6

**Statutes**

5 U.S.C. § 552(a)(3)(A) ........................................................................................ 4

5 U.S.C. § 552(a)(6)(E)(i) .................................................................................. 23

5 U.S.C. § 552(a)(6)(E)(v)(II) ........................................................................... 24

5 U.S.C. § 552(a)(8) ............................................................................................ 1

5 U.S.C. § 552(a)(8)(A) ..................................................................................... 21

5 U.S.C. § 552(a)(8)(A)(i)(I) ............................................................................. 20

5 U.S.C. § 552(b) ................................................................................................. 4

5 U.S.C. § 552(b)(5) ......................................................................................... 1, 3

28 U.S.C. § 1657(a) ........................................................................................... 23

42 U.S.C. § 7521(a)(2) ....................................................................................... 23

42 U.S.C. § 7607(d)(7)(B) ................................................................................. 23

**Miscellaneous**

77 Fed. Reg. 62,623 (Oct. 15, 2012) .................................................................. 8

H.R. Rep. No. 985, 98th Cong., 2d Sess. 6 (1984) ........................................... 23

EPA, *Draft Technical Assessment Report: Midterm Evaluation of Light-Duty Vehicle
Greenhouse Gas Emission Standards & Corporate Average Fuel Economy Standards
for Model years 2022-2025*, at ES-1, EPA-420-D-16-900 (July 2016) ................................... 15

## INTRODUCTION AND SUMMARY OF ARGUMENT

EPA plans to finalize this summer a rulemaking that would dramatically weaken existing greenhouse-gas emission standards for new cars and trucks through the middle of the next decade. At the same time, the agency is withholding factual information that is apparently at odds with EPA's planned course of action. FOIA exists to prevent precisely this sort of government secrecy. Because EPA has not met its burden under FOIA to show that this information may be withheld, Plaintiffs respectfully request that this Court expeditiously order this information released.

At issue is one element of EPA's "OMEGA" computer model: the current version of the "core" model. The core model is a basic-accounting tool—a specialized calculator—that calculates how vehicle manufacturers can add available technology to their fleets to reduce greenhouse-gas emissions. EPA does not dispute this point. Yet the agency still claims, incorrectly, that the core model is a "memorandum" or "letter" to which the deliberative-process privilege attaches, 5 U.S.C. § 552(b)(5), and that its disclosure to the public will "harm" EPA decisionmaking, *id.* § 552(a)(8).

This is an unprecedented position for EPA. The agency developed OMEGA using a public process and released several then-current versions of the model (including the core model) along with copious documentation explaining its design and development. Agency employees discussed details of the model with interested public stakeholders and actively encouraged the public's input in order to optimize the model's calculations. It is only now, as EPA takes steps to greatly weaken emission standards, that the agency is withholding this crucial computational tool from the public.

EPA's decision not to release the current version of the OMEGA core model is unlawful for several reasons. *First*, the deliberative-process privilege incorporated into FOIA Exemption 5 applies only to "memorandums" or "letters." The OMEGA core model is not a "memorandum," "letter," or any analogous form of communication.

*Second*, the OMEGA core model itself does not contain or reveal agency "deliberations." EPA suggests the core model will reveal the mental processes behind selecting facts for modeling, but the agency is eliding the difference between the core model and the inputs to that model. The selection of facts in OMEGA occurs in preparing the input files, all of which EPA has released in this litigation without invoking any privilege. EPA also summarily contends, for the first time in this litigation, that this version of the OMEGA core model is only a "draft," because the agency has not "finalized" it. Apart from being circular, EPA's contention is rebutted by specific record evidence—including an affidavit from a former EPA official who oversaw four of the five public releases of the OMEGA model—that the agency does not have a formal procedure to "finalize" versions of the model, nor are upper-level policymakers required to review and approve them.

*Third*, this version of the OMEGA core model is not "predecisional" because the agency has said it is not relying on the model to make the very decision that the model was specifically designed to inform. EPA posits that it might change its mind years from now and use whatever version of the OMEGA model will then be current to inform some undefined future decision. But an agency must present more than bare speculation to justify withholding records requested under FOIA. A 2016 amendment to the statute requires agencies to release records that, even if exempt, will not actually be harmful to disclose. EPA's generic response—that releasing any deliberative record will chill deliberations—could apply to any record and would sap Congress' "foreseeable harm" amendment of all force. The public history of the OMEGA model belies EPA's speculation about harm to agency decisionmaking from disclosure of yet another version of the core model.

In the final analysis, EPA falls well short of its burden to demonstrate that harm will flow from releasing the current core model. The overarching objective of FOIA is disclosure, and the Act's limited exemptions are not a refuge in which to bury inconvenient facts. Congress intended

for FOIA "to provide a means of accountability, to allow Americans to know what their government is doing." *Brennan Ctr. for Justice v. Dep't of State*, 300 F. Supp. 3d 540, 545 (S.D.N.Y. 2018). EPA is violating FOIA by unlawfully withholding the latest version of the OMEGA core model from the public, and this Court should order the model's immediate release.

## ARGUMENT

## I.   EXEMPTION 5 DOES NOT APPLY TO THE OMEGA v.1.4.59 CORE MODEL.

### A.  The OMEGA v.1.4.59 core model fails the first condition of Exemption 5.

The Supreme Court has stressed that "the first condition of Exemption 5 is no less important than the second." *Dep't of the Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 9 (2001). Under the first condition, only "inter-agency or intra-agency *memorandums or letters*," 5 U.S.C. § 552(b)(5) (emphasis added), may be withheld under Exemption 5. Plaintiffs have shown (Mem. 14-16) that the accounting program at issue in this case is not a *memorandum or letter* under any reasonable interpretation of those words. That ends the inquiry and means that the program must be disclosed under FOIA.

EPA criticizes (Mem. 21-22) Plaintiffs' "novel" reliance on the language of Exemption 5 as probative of its meaning. But the Supreme Court has cautioned that the proper construction of a FOIA exemption always "starts with its text," irrespective of whether prior "[j]udicial decisions … have analyzed and reanalyzed the meaning of the exemption" while focusing "comparatively little attention on" its "simple words." *Milner v. Dep't of the Navy*, 562 U.S. 562, 569 (2011). This Court should reject EPA's plea (Mem. 21) to ignore the ordinary meanings of *memorandum* and *letter*. Consistent with those ordinary meanings, *see* Pls. Mem. 14-15, this Court should hold that Exemption 5 does not embrace "non-communication forms" of information, Def. Mem. 21.

EPA treats *memorandums or letters* like "a purely conclusory [phrase], just a label to be placed on any document the Government would find it valuable to keep confidential." *Klamath*,

532 U.S. at 12. But, if that phrase is to retain any "independent vitality" in Exemption 5, *ibid.*, it must be interpreted more narrowly than *records*, the catchall term encompassing all information subject to FOIA, *see* 5 U.S.C. § 552(a)(3)(A). *See also Milner*, 562 U.S. at 565 (emphasizing that FOIA exemptions "must be 'narrowly construed'"). If Congress had intended for Exemption 5 to cover government documents of any stripe that would be privileged in litigation, Congress would have said so, by using the word "records" (as in Exemption 7); using another, similarly expansive descriptor like "information" (as in Exemptions 4, 7, and 9); or omitting a descriptive noun (as in Exemptions 1, 2, and 3). *See id.* § 552(b). Instead, Congress coined a new phrase, *memorandums or letters*, with no antecedent in FOIA or elsewhere in the United States Code. This Court must presume that Congress intended for that phrase "to have a particular, nonsuperfluous meaning," *Bailey v. United States*, 516 U.S. 137, 146 (1995), that is narrower than *records*. Only Plaintiffs have offered such a meaning (Mem. 14-15): A *memorandum or letter* is a "communication." *See Klamath*, 532 U.S. at 9 (using "communication" as shorthand for "memorandum or letter").

EPA does not cite any case in which the court squarely addressed whether computer code is a *memorandum or letter*. The agency argues (Mem. 21-22) that some courts have classified non-communication forms of information as *memorandums or letters*. But the records withheld in those cases obviously were communications. In *Lead Industries Ass'n v. Occupational Safety & Health Administration*, 610 F.2d 70 (2d Cir. 1979), for example, the Second Circuit ruled that an agency could withhold under Exemption 5 "tabular and graphic summaries" that federal officials included in a "report" "to facilitate understanding." *Id.* at 85. Likewise, the "cost estimates" deemed exempt in *Quarles v. Department of the Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990), appeared in a "report" that conveyed those estimates to agency decisionmakers, *id.* at 391. Plaintiffs do not dispute that *memorandums or letters* may feature numbers; indeed, tables and graphs are a common way to

communicate the meaning of numbers. But that does not mean every agency record that contains numbers—even "binary machine language (0s and 1s)," Def. Mem. 16 n.7 (citation omitted)—is a *memorandum or letter* that an agency may withhold under Exemption 5. In sum, the OMEGA v.1.4.59 core-model code is <u>not</u> a *memorandum or letter*, and EPA must disclose it.

### B.   The OMEGA v.1.4.59 core model fails the second condition of Exemption 5.

Exemption 5's second condition incorporates "what is sometimes called the 'deliberative process' privilege." *Klamath*, 532 U.S. at 8. As a threshold matter, EPA's two declarations lack the requisite "detailed explanations" to show that the core model could fall within that privilege. *Florez v. C.I.A.*, 829 F.3d 178, 182 (2d Cir. 2016). Regardless, the privilege does not apply here because the OMEGA v.1.4.59 core model is neither "deliberative" nor "predecisional." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002). The core model is not *deliberative*; it is an objective, computational tool that does not reveal any subjective judgment of EPA policymakers. And v.1.4.59 of the model is not *predecisional* because EPA itself has disavowed reliance on the model as a source of information for the only specific decision now facing the agency.

### 1.   EPA has not provided sufficient detail to invoke the deliberative-process privilege.

EPA bears the burden of demonstrating that the OMEGA v.1.4.9 core model is exempt, and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez*, 829 F.3d at 182. EPA's position that the core model is exempt from disclosure "receives no deference." *Bloomberg, L.P. v. Bd. of Gov'rs of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010). Affidavits filed in support of an agency's invocation of a FOIA exemption generally are accorded a presumption of good faith. *Florez*, 829 F.3d at 182. But that presumption "only applies when accompanied by reasonably detailed explanations of why material was withheld." *Ibid.* Affidavits also must establish that "information logically falls within the claimed exemption,"

and they must not be "controverted by … contrary evidence in the record." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009). Courts will not credit averments that "are conclusory," "vague" or "merely recit[e] statutory standards." *Quinon v. F.B.I.*, 86 F.3d 1222, 1227 (D.C. Cir. 1996). *See also Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*, --- F. Supp. 3d ---, 2019 WL 1380334, at *4-*9 (S.D.N.Y. Mar. 26, 2019) (discussing these requirements for affidavits).

The two affidavits submitted by EPA lack the reasonable detail necessary to show that the OMEGA v.1.4.59 core model could logically fall within the deliberative-process privilege. EPA's affiants do not dispute the detailed technical description of OMEGA in Plaintiffs' memorandum of law and supporting declarations. *Cf.* Pls. Mem. 6-8, 20. EPA officials recognize that OMEGA has several distinct components, Charmley Decl. ¶ 10, but their affidavits frequently—and sometimes misleadingly—elide important differences among those components. In particular, the OMEGA input files and core model are materially different. The OMEGA model "relies heavily on its input files," Pls. Mem. 8 (quoting EPA's own documentation), and "the culling and selection of facts in OMEGA occurs, if at all, in preparing the data files," *id*. at 20. In response to this litigation, EPA released the *input files* in full without asserting deliberative-process privilege. In contrast, the *core model* that EPA is withholding "is simply a computational tool—a type of specialized calculator." *Id.* at 7 (quoting Lutsey Decl. ¶ 22).

Plaintiffs discuss in more detail below the specific instances where an EPA affidavit does not substantiate the agency's position. But the following example is illustrative: EPA asserts that OMEGA versions have only ever been released in "final" form, Wehrum Decl. ¶ 13, and that no version of the model can be "finalize[d]" without "briefing and approval from high-level policy makers," Charmley Decl. ¶ 21. The agency does not state the positions these policymakers hold, or represent that they have ever actually received such a briefing on the OMEGA core model or

approved it for release. Margo Oge, the former director of the EPA office that developed OMEGA, avers that no such briefing or approval took place for the first four of the five public releases of OMEGA; that no such practice existed; and that several versions of the model were released in advance of final actions in order to invite public review. Oge Supp. Decl. ¶¶ 10, 12. Similarly, the fifth and final release was expressly made in connection with a non-decisional document. *See id.* ¶ 12. EPA's unsupported assertion that "upper-level decisionmakers may work with technical staff" to make "substantive analytical changes to the core model," Wehrum Decl. ¶ 11, therefore would represent a sharp break from the agency's practice through at least 2012, when upper-level policymakers were not involved in amending the core model, *see* Oge Supp. Decl. ¶ 8.

EPA's affiants do not assert that the agency made *any* substantive, policy-related revision to the OMEGA core model between versions 1.4.56 (publicly released in July 2016) and 1.4.59 (available no later than April 2018, *see* Charmley Decl. ¶ 19; Lutsey Decl., Ex. B). Remarkably, EPA argues that the latter version is privileged because its disclosure "would reveal '*whether or not* substantive analytical changes have been made.'" Def. Mem. 12 (quoting Wehrum Decl. ¶ 14 (emphasis added)). Stating that *EPA can neither confirm nor deny* the existence of new material that would expose deliberations is not the "reasonably detailed" explanation that FOIA demands. *Florez*, 829 F.3d at 181-82. Otherwise, EPA could use Exemption 5 to withhold *any* memorandum or letter because the agency hypothetically could have appended some deliberative material to it.

Indeed, the hypothetical EPA posits—that the agency may have incorporated an economic simulation or "consumer choice" model subsequent to its release in 2016, Wehrum Decl. ¶ 18— merely highlights the deficiency of the agency's affidavits. EPA *did* develop a consumer-choice model *in 2012*, and it told the public as much. Cooke Decl. ¶¶ 4-6. In EPA's most recent OMEGA release in 2016, the consumer-choice model was encoded in the OMEGA core model, but turned

off.[1] *Id.*  ¶¶ 10, 14. Moreover, the input files that EPA already has disclosed for v.1.4.59—which have exactly the same consumer-choice inputs as v.1.4.56 (released in 2016), *id.* ¶ 12—reveal that it is "highly unlikely" that the preexisting consumer-choice model has been altered, *id.* ¶ 15. That upper-level agency policymakers apparently were not aware of this seven-year-old feature of the OMEGA model only shows that the policymakers are not directly involved in its development.

### 2.   The OMEGA core model is not "deliberative."

The archetypal deliberative document shielded by Exemption 5 is a recommendation that communicates the writer's subjective opinions to agency decisionmakers for consideration in a specified process of policy formulation. *See, e.g.*, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 352 (2d Cir. 2005); *Tigue*, 312 F.3d at 73; *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482-83 (2d Cir. 1999). The OMEGA v.1.4.59 core model looks nothing like that. *See* Cooke Decl., Ex. A. It is a computational tool—a basic accounting program—that consists of lines of computer programming code. *See, e.g.*, Pls. Mem. Ex. K. The core-model code does not reveal a "process by which factual [modeling] material was assembled through an exercise of judgment." *Color of Change v. U.S. Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). The overall OMEGA model reflects such a process, if at all, in the *input* files over which EPA has not asserted any privilege.  Because v.1.4.59 of the core model is not itself "deliberative," it must be released.

EPA admits (Mem. 13) that the core model is a factual, scientific tool. As a general rule, such material is not privileged. *See Cuomo*, 166 F.3d at 482. The standard for evaluating whether

---

[1]      In fact, there is no evidence that the consumer-choice model has ever been turned *on* by EPA. *See, e.g.*, 77 Fed. Reg. 62,623, 62,916/3 (Oct. 15, 2012) (stating that "EPA is therefore not using its preliminary consumer choice model").

such material may be exempt from disclosure is not in dispute.[2] A record may be withheld if its release would reveal "the process by which 'factual material was assembled through an exercise of judgment.'" *Color of Change*, 325 F. Supp. 3d at 455. Put another way, the factual document could be protected if the document itself would "reveal the deliberative process of selection" that led to particular facts being included in that document. *Lead Indus.*, 610 F.2d at 83.

The OMEGA v.1.4.59 core model does not contain or indirectly reveal such judgments. In its attempt to shoehorn the core model into the narrow exception for deliberative factual material, the agency conflates the OMEGA core model with (i) already-released OMEGA input files, and (ii) memorialized discussions among officials *about* OMEGA. EPA also summarily contends that v.1.4.59 of the OMEGA core model is a "deliberative draft." Those arguments are untenable.

### a. The OMEGA core model does not reveal the subjective process of factual selection.

EPA glosses over material distinctions among the components of OMEGA. It cannot be overemphasized that all that remains in dispute is the v.1.4.59 core model. The agency does not contest that the core model "is simply a computational tool—a type of specialized calculator." Pls. Mem. 7 (quoting Lutsey Decl. ¶ 22). The OMEGA core model's cost-minimization function is guided by mathematical principles, not the subjective opinion of any agency decisionmaker or subordinate. *Contra* Def. Mem. 17 n.8. The core model has a "simple" user interface, and "all of

---

[2] EPA raises several strawman arguments. Plaintiffs have never suggested "that scientific deliberations are unprotected." Def. Mem. 15. As a public health agency, EPA's deliberations in particular should be overwhelmingly focused on scientific considerations, often to the exclusion of political or other expedient considerations. The reason that the OMEGA v.1.4.59 core model must be disclosed under FOIA is not that it is scientific but rather that it is not deliberative. *See* Pls. Mem. 16-20. Nor did Plaintiffs posit a simple "dichotomy" between facts and deliberation. Def. Mem. 12. Rather, Plaintiffs acknowledge (Mem. 16-17) that each record falls somewhere on a fact-deliberation "spectrum." "In limited circumstances, factual records may be considered for deliberative protection." Pls. Mem. 18. This case just does not present one of those circumstances.

the information needed to run the model is contained in the input files." Pls. Mem. 8 (quoting the agency's own model documentation); *see also* Cooke Decl., Ex. A.

EPA has not asserted any privilege over these input files. Plaintiffs have shown, and EPA has not rebutted, that the "culling and selection" of pertinent facts in OMEGA "occurs, if at all, in preparing the data files" that the agency has released. *Id.* at 20. These inputs are no longer at issue. Nor do Plaintiffs seek EPA e-mails or memoranda *about* OMEGA, such as records memorializing model runs performed by agency employees. Release of such records plausibly might reveal the content of privileged EPA deliberations. But disclosure of the core model itself—a computational tool with a simple interface—could not plausibly expose privileged details of EPA deliberations about *why* certain inputs were selected for use in the model rather than others.

The agency's authorities (Mem. 13-15) illustrate the point. EPA cites *Center for Biological Diversity v. EPA*, 2019 WL 1382903 (D.D.C. Mar. 27, 2019), for the uncontroversial proposition that documents revealing "the collection, culling and assessment of factual information" may be deliberative. EPA. Mem. 13. In that case, the plaintiffs sought EPA records concerning findings that a new pesticide would have no effect on endangered species. 2019 WL 1382903, at *1. But the requested records were internal emails, internal briefing documents, and written drafts of the final released findings. *Id*. at *15-*16. The records sought were, in other words, not the agency's underlying data or factual material, but rather the memorialized discussions *about* that data.

Plaintiffs acknowledge that an intra-agency email discussing "the collection, culling, and assessment" of OMEGA-related data might be exempt from disclosure, but Plaintiffs do not seek such records. Further, as noted above, the "deliberative" culling and selection of data for OMEGA occurs, if at all, in the preparation of the input-data files that EPA has already released without a

claim of privilege. *See* Pls. Mem. 16-17, 20. The OMEGA core model is thus at a second remove from the deliberative "selection" emails and reports withheld in *Center for Biological Diversity*.

EPA also invokes *Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241 (D.D.C. 2017), to argue that an agency will need to deliberate in the process of creating a model. Def. Mem. 14. Plaintiffs do not dispute that general proposition. But *Urban Air Initiative* does not support EPA's withholding of the OMEGA core model. Just as in *Center for Biological Diversity*, the plaintiffs in *Urban Air Initiative* sought not the model code but e-mails and other prose documents related to a pre-modeling "study." 271 F. Supp. 3d at 261-262; *see also* EPA Ex. HH, *Urban Air Initiative*, D.D.C. No. 15-cv-01333 (Sept. 2, 2016) (Dkt. 19-11) (EPA's *Vaughn* index for withheld records). EPA selectively quotes (Mem. 14) *Urban Air Initiative* as declaring that the "sorts of decisions" involved in developing the study were "exactly the type of agency judgments that the deliberative process privilege protects," 271 F. Supp. 3d at 261. The agency omits the court's explanation that the "decisions" were "reached through the exchange of emails and other internal agency records." *Ibid.* In other words, the court in *Urban Air Initiative* upheld EPA's withholding of inter-agency communications that directly memorialized the "internal discussions" of agency personnel. *Ibid.* Plaintiffs are not seeking any analogous communications in this case.

EPA relies heavily on *Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184 (D.D.C. 2009), but that case did not involve "a parallel challenge to the withholding of an EPA 'draft groundwater flow model.'" Def. Mem. 13 (quoting 593 F. Supp. 2d at 189). Although the court's opinion at times referred broadly to the "model," the actual processing code—equivalent to the core model withheld here—was publicly available. *See* Declaration of K. Takata, EPA, ¶ 27, *Goodrich Corp. v. EPA*, D.D.C. No. 08-cv-01625-JDB (Oct. 20, 2008) (Dkt. 17-2) (stating that an EPA official had informed plaintiffs "that the model code" could be obtained from an EPA vendor). The *Goodrich*

plaintiffs instead requested all draft iterations and calibrations records of inputs to the model. *See Goodrich*, 593 F. Supp. 2d at 189. The release of these "evolving iterations," the court reasoned, might reveal "the selection and calibration of data [that] is part of the deliberative process." *Ibid*. Here, as in *Goodrich*, the selection and calibration of data occurs outside the core model and, in any event, the relevant input data already has been released by EPA without a claim of privilege.

EPA's treatment (Mem. 15-17) of Plaintiffs' authorities further illustrates the distinctions between potentially deliberative materials and the OMEGA v.1.4.59 core model. *First*, as Plaintiffs have recognized (Mem. 18), the records at issue in *Reilly v. EPA*, 429 F. Supp. 2d 335 (D. Mass. 2006), were model outputs that would, in turn, reveal the agency's choice of model inputs. 429 F. Supp. 2d at 348–49, 352. The salient point is that the court in *Reilly* considered EPA's *inputs* the part of the overall model that might be most reflective of judgment (and even that possibility did not, in the court's view, justify withholding the outputs). Furthermore, EPA ignores that, when discussing the overall modeling process, the *Reilly* court stated that "the internal workings of [the model]," *i.e.*, the core model, were "*not in any way deliberative*." *Id.* at 353 (emphasis added).

*Second*, EPA fails in its attempt (Mem. 16) to distinguish *Lahr v. National Transportation Safety Board*, 2006 WL 2854314 (C.D. Cal. Oct. 4, 2006), on the basis that the model there was "final," whereas OMEGA v.1.4.59 is a "draft." As discussed *infra*, pages 13-16, EPA's "draft" label for OMEGA v.1.4.59 is conclusory and contradicted by record evidence. In any event, *Lahr* did not turn on the "finality" of the model at issue. The agency's problem was a lack of "evidence that, by reviewing the disclosed source file, a reader would be able to understand or reconstruct the [agency's] deliberative process." 2016 WL 2854314 at *24. EPA has the same problem here. Like the "executable file" in *Lahr*, *id.* at *23, the OMEGA core model is "merely a tool used in connection with other data to derive a result based upon that data," *id.* at *24.

*Finally*, in *Cleary, Gottlieb, Steen & Hamilton v. Department of Health & Human Services*, 844 F. Supp. 770 (D.D.C. 1993), the court permitted an agency to withhold the bespoke computer programs of a single researcher, Dr. Philen. Her programs were "uniquely" tailored to a specific epidemiological database; the research required "continuous changes" in data selection; and the "frequent" iterative revisions to her program code, coupled with the output files, made it possible to trace her personal "mental processes." *Id.* at 782–83. *Cleary* is best understood as protecting the record of the modeling performed by a single, identifiable individual from disclosure.[3] Moreover, unlike in *Cleary*, the "culling and selection" of facts in the OMEGA modeling process occurs, if at all, when preparing the input files that EPA already has disclosed as not privileged. *Id.* at 783.

### b.   The OMEGA v.1.4.59 core model is not a deliberative draft.

EPA's primary ground for withholding the core model as deliberative is that the v.1.4.59 core model is purportedly an incomplete "draft." The agency then contends (Mem. 17-18) that, because it has voluntarily released the v.1.4.56 core model, Plaintiffs will be able to compare the versions and forensically deduce "EPA staff's mental processes." Both these arguments lack merit.

### i.   The OMEGA v.1.4.59 core model is not a "draft."

EPA's bare assertion that the OMEGA v.1.4.59 core model is a "draft" is suspect. As far as Plaintiffs can tell, this is the first time during this litigation that the agency has suggested that the current version of OMEGA is an incomplete draft. EPA's answer; its earlier briefing in this case; its final decision on Plaintiff's FOIA request; and its letters to this Court all indicated that

---

[3]     EPA claims (Mem. 19) that disclosure of records attributable to a single individual is no likelier to chill candid deliberations than records that cannot be so attributed. Human experience suggests otherwise, as does the law. *See, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (explaining that one purpose of the deliberative-process privilege is to protect individual "subordinate[]" government officials from "public ridicule or criticism"). Furthermore, EPA has not established in this case that the public would have any way to identify which agency official(s) directed any changes to the OMEGA core model after its latest release.

OMEGA v.1.4.59 was complete. The FOIA determination, for example, represents that "EPA is withholding the latest *full* version of the OMEGA model itself (version 1.4.59)." Pls. Mem. Ex. D (emphasis added). Now, however, an EPA official has attested that OMEGA v.1.4.59 is not "complete." Charmley Decl. ¶ 20. The agency has yet to explain the difference between a "full" model and a "complete" model.[4] In any event, EPA's claim that the OMEGA v.1.4.59 core model is a deliberative draft lacks merit.

EPA's basis for classifying the OMEGA v.1.4.59 core model as a "draft" is the bare, and tautological, contention that it has not been "finalized." *See, e.g.*, Wehrum Decl. ¶ 17 ("Before it is released publicly alongside a regulatory action, the OMEGA model is in draft form."). But the only process "necessary to finalize the OMEGA model" that EPA actually identifies is supposed "briefing and approval from high-level policymakers." Charmley Decl. ¶ 21. In other words, EPA asserts that OMEGA is only ever in "final" form when senior officials explicitly declare it to be final. The Second Circuit has rejected this sort of clear-statement requirement elsewhere, *e.g.*, *La Raza*, 411 F.3d at 357 n.5, and with good reason. Affording an agency open-ended discretion to formally denote as a "draft" a functionally "final" record would undermine FOIA's "dominant objective" of disclosure. *Klamath*, 532 U.S. at 7-8.

EPA does not claim that any change to the v.1.4.59 core model source code is technically or practically necessary to facilitate public release. And the agency offers no evidence that "high-level policymakers" direct any changes to the core model source code. Historically, EPA has not

---

[4] EPA has inconsistently described the model throughout this litigation. For example, in a March 19, 2019, letter to this Court, the agency represented that the "[OMEGA] model" does not encompass the "pre-processors," and that the "pre-processors" are "not necessary to fully utilize the OMEGA model." (*See* Dkt. 34 at 1.) EPA now contradicts those representations and declares that the same "pre-processors" are a "*main component*[]" of "the OMEGA model," that translate input data "into the necessary form" for the "core model." Charmley Decl. ¶ 10 (emphasis added).

had any "finalization" policy or practice for the OMEGA core model. *See* Oge Supp. Decl. ¶¶ 5, 8, 10-11. In this litigation, EPA asserts that it has only ever released "final" versions of OMEGA, Def. Mem. 19 (citing Wehrum Decl. ¶ 7), but it offers no support for that assertion, and there is strong contrary evidence in the record.

The former Director of the EPA Office responsible for OMEGA has asserted definitively that no such "review and approval" policy existed during her tenure, when EPA released the first four public versions of the OMEGA model. *See* Oge Supp. Decl. ¶¶ 10-11. Rather, EPA released the current version of the model when "it was most likely that public stakeholders would utilize the model." *Id.* ¶ 11. Thus, EPA published OMEGA, "including the core model," in conjunction with proposed rules "in order to invite public input and review." *Id.* ¶ 12. These proposal models "explicitly were not 'final' versions of OMEGA used to inform final agency decisions." *Ibid.*

There is no evidence of a shift in agency practice since Plaintiffs' affiant retired in 2012. To the contrary, EPA's fifth and most recent release of the OMEGA core model (version 1.4.56) in 2016 was made in connection with a "Draft Technical Assessment Report (TAR)," which the agency clarified was "a technical report, not a policy decision document." EPA, *Draft Technical Assessment Report: Midterm Evaluation of Light-Duty Vehicle Greenhouse Gas Emission Standards & Corporate Average Fuel Economy Standards for Model years 2022-2025*, at ES-1, EPA-420-D-16-900 (July 2016). Plaintiffs also have proffered evidence that "EPA staff were empowered to share information about the model with stakeholders at all other times," outside the context of formal public releases, Oge Supp. Dec. ¶ 11; *see also id.*, Exs. A & B, and there is no evidence of a change in practice on this score. In short, the record overwhelmingly contradicts EPA's position that only inherently "final" versions of OMEGA have been (or could be) released.

The current version of the OMEGA core model, v.1.4.59, has been the current version for more than a year, since at least April 2018. *See* Charmley Decl. ¶ 19. That specific version of the core model was functional enough then—and agency officials confident enough in it—for EPA to run the model and present results to the Office of Management and Budget within the Executive Office of the President. *Ibid.* In sum, beyond EPA's bald assertion in litigation, nothing suggests that the v.1.4.59 core model is a "draft." It is, according to EPA, the "latest full version," *see* Pls. Mem. Ex. D, and it must be released under FOIA

### ii.      The OMEGA v.1.4.59 core model is not a *deliberative* draft.

Even assuming that the OMEGA v.1.4.59 core model remains a "draft" in any meaningful sense, EPA still has failed to demonstrate that it is a *deliberative* draft. Plaintiffs acknowledge that some "draft" documents can fall within FOIA's Exemption 5. *See, e.g.*, *Color of Change*, 325 F. Supp. 3d. at 453. But "that something is labeled a draft . . . is not enough to render it privileged." *Nat'l Day Laborer Org. Network v. U.S. Imm. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 741 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011). A "draft" is exempt from disclosure under FOIA only "if it contains discussions that reflect the policy-making process." *Ibid. Accord Arthur Andersen & Co. v. I.R.S.*, 679 F.2d 254, 257–58 (D.C. Cir. 1982) ("Even if a document is a draft of what will become a final document, the court must also ascertain whether the document is deliberative in nature." (internal quotation marks and citation omitted)).

 EPA asserts, again without support, that the OMEGA v.1.4.59 core model itself "reflects the give-and-take" of the agency's consultative process of policy formation and is deliberative for that reason. Def. Mem. 12. EPA later suggests (Mem. 17) that the content of this consultative

give-and-take—the mental processes of its staff—can be understood by examining the "iterative revisions" to the OMEGA model.[5] This assertion is flawed for at least three reasons:

*First*, EPA's assertion (Mem. 17) that the OMEGA core model is "continually modified," giving rise to the possibility of forensic reassembly of "the opinions of the staff developing the model," is misleading. As elsewhere, EPA's vague statement that "the entire OMEGA model" is updated "monthly or even weekly," Wehrum Decl. ¶ 11, elides the important distinctions among the different components of OMEGA. *See supra*, page 6. The model's *inputs*, the data files on which the overall model "relies heavily," Pls. Mem. 8, may be updated by EPA technical staff to reflect real-world developments on a monthly timescale. But the only component at issue here— the OMEGA *core model*—is just a specialized calculator: an "accounting" program that reads the input data and performs a pre-set series of mathematical computations on that data. *See* Pls. Mem. 17; Lutsey Decl. ¶¶ 9, 22. The most recent version of the core model, v.1.4.59, has been in place since at least April 2018. *See* Charmley Decl. ¶ 19. EPA thus has not demonstrated that the core model is subject to frequent, "iterative revisions." Def. Mem. 17.

*Second*, comparing two standalone versions of a computer model is a prospect different in kind from comparing two drafts of a memorandum. Memorandums are written in prose and for the purpose of communicating ideas and supporting rationales: employees literally "spell out in writing the pitfalls as well as strengths of policy options." *Center for Biological Diversity*, 2019 WL 1382903, at *10 (quoting *Judicial Watch, Inc. v. Dep't of Defense*, 847 F.3d 735, 739 (D.C.

---

[5] EPA protests (Mem. 17) that Plaintiffs have not explained why comparing the v.1.4.59 core model to the last released v.1.4.56 core model would not reveal the content of deliberations by agency officials. Plaintiffs have given an exhaustive explanation, but regardless, they do not bear this burden. It is black-letter FOIA law that EPA has the burden to explain why comparing the source codes *would* reveal such consultative content—and all doubts are resolved in favor of disclosure, not secrecy. *See Florez*, 829 F.3d at 182.

Cir. 2017)). Comparing "before" and "after" revisions of a memorandum can provide easy insight into the thinking behind the change because both the versions "spell out" *why* they reached their conclusions. In contrast, computer codes reveal what code was programmed, but not why it was programmed that way. *See* Pls. Mem. 18. Even assuming a computer science expert could comb through tens of thousands of lines of code to determine before and after differences, without the respective *rationales* spelled out, any deliberations concerning the revision will be inscrutable.

 *Finally*, EPA conspicuously does not claim that there actually has been any substantive, policy-driven revision between the OMEGA v.1.4.56 and v.1.4.59 core models that potentially could be extrapolated from the withheld records. EPA asserts only (Mem. 4) that disclosure of the v.1.4.59 core model "would reveal whether or not substantive analytical changes have been made."[6] But the lone hypothetical change posited by EPA—creation of a new "consumer choice" model, Wehrum Decl. ¶ 18—underscores why the agency's explanation is not the "reasonably detailed" one that FOIA requires, *Florez*, 829 F.3d at 182. EPA developed a dormant consumer-choice model for OMEGA years ago, *see supra*, pages 7-8, a fact of which the current Assistant Administrator appears unaware—reinforcing that he has not engaged with the internal workings of the OMEGA model. The input files that EPA has disclosed to Plaintiffs for v.1.4.59 (without asserting deliberative-process privilege) indicate that the consumer-choice model is still turned "off," Cooke Decl. ¶ 14, so EPA already has "revealed … that [it] did not add such a feature" to OMEGA v.1.4.59, Wehrum Decl. ¶ 19. *See also* Cooke Decl. ¶ 15-16.

*  *  *

---

 [6] EPA also vaguely states (Mem. 4) that the "model" has been updated "in various ways," but, as before, the agency fails to distinguish among the different model components. Specifically, EPA is conspicuously vague about the extent to which those "various" updates were made to the core model, or, more likely given their prominence in the function of OMEGA and susceptibility to change, the input data and processors that EPA has not argued are deliberative material.

The OMEGA v.1.4.59 core model is a computational tool—a basic accounting program. The core model is programmed in computer code and does not contain any subjective "advisory opinions, recommendations [or] deliberations." *Klamath*, 532 U.S. at 8. Release of this version of the core model will not reveal the subjective judgments of policymakers, any more than past versions have. The OMEGA v.1.4.59 core model is thus not *deliberative* and must be released.

### 3.   The OMEGA v.1.4.59 core model is not "predecisional."

To qualify as "predecisional" for Exemption 5 purposes, a *memorandum or letter* must be "prepared in order to assist an agency decisionmaker in arriving at [its] decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975). "Although an agency need not 'pinpoint' an exact decision made in reliance on the [withheld record], it must show, *ex ante,* that the document 'related to a specific decision facing the agency.'" *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 911 F. Supp. 2d 261, 272 (S.D.N.Y. 2012). EPA wrongly contends (Mem. 10) that OMEGA v.1.4.59 is predecisional because it "was prepared" for "EPA's decisionmaking concerning" the "future final versions of OMEGA" and "broader regulation of auto emissions."

OMEGA v.1.4.59 does not qualify as predecisional merely because EPA plans to develop v.1.4.60. New versions of OMEGA are not "decisions" with legal effect; rather, the model is (or should be) used to inform such decisions. Outside the rare case where the record in question is a draft decision document, the bare possibility that a record may be revised at some point does not make it predecisional. EPA must identify a *decision* related to and predated by OMEGA v.1.4.59.

EPA's "broader regulation of auto emissions" (Mem. 10) does not count. There is only one "specific decision" on that topic "facing the agency" in the foreseeable future, *Tigue*, 312 F.3d at 80: Whether to modify greenhouse-gas standards for light-duty vehicles of model years 2021-2025 and what standards to establish for model year 2026. *See* Pls. Mem. 8-11. EPA officials now have

disavowed reliance on the OMEGA model as a source of information for that decision. Wehrum Decl. ¶ 8; Charmley Decl. ¶ 18. Those disavowals fatally undermine EPA's position that OMEGA v.1.4.59 is predecisional. Because the agency is on record that it is not relying on the model or the information that it generates, there is no risk that releasing the current version would prematurely disclose policy or confuse the public as to the grounds for EPA's decision. *See* Pls. Mem. 22-23.

EPA resorts (Mem. 11) to speculation that it might change course in the future and decide to use whatever version of OMEGA is then current to inform its decision on the appropriate level of greenhouse-gas emission standards. But that conclusory assertion, *see* Wehrum Decl. ¶ 9, does not carry the agency's burden to establish that Exemption 5 applies to OMEGA v.1.4.59. Nothing in EPA's declarations, moreover, demonstrates that it is "reasonably foresee[able]" that disclosure of a 2018 version of OMEGA will "harm" EPA's eventual decisionmaking processes for emission standards for vehicles of model year 2027 and beyond. 5 U.S.C. § 552(a)(8)(A)(i)(I).

The agency is trying to have it both ways. To bolster its argument that the OMEGA model is *deliberative*, EPA claims (Mem. 3, 12) that it "is in a continuing process" involving "monthly or even weekly updates" to the model. But then, in support of its argument that OMEGA v.1.4.59 is *predecisional*, EPA speculates (Mem. 11) that disclosing a 2018 version of the model will hinder its decision on the level of emission standards that will apply to vehicles manufactured nearly a decade later, as part of a rulemaking that EPA will commence at some unknown date years from now. Either this latest version of OMEGA will be operative far longer than the agency posits, or else that version will be so overtaken by serial updates as to be irrelevant to EPA's decisionmaking process in the next round of greenhouse-gas emission standards for light-duty vehicles. Whatever the case, EPA has not shown that OMEGA v.1.4.59 is subject to the deliberative-process privilege.

**C. Even if Exemption 5 applies to portions of the OMEGA v.1.4.59 core model, EPA still is withholding agency records in violation of FOIA.**

For reasons just stated, Exemption 5 does not apply to any record that EPA is withholding. But, if this Court were to conclude otherwise, it still should order the agency to disclose records because (1) EPA has not identified a reasonably foreseeable harm that will ensue from disclosure, and (2) the executable OMEGA v.1.4.59 program is reasonably segregable from its source code.

**1. EPA has not shown foreseeable harm from disclosure of the OMEGA v.1.4.59 core model.**

The FOIA Improvement Act of 2016 requires an agency to "release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest." *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018) (discussing 5 U.S.C. § 552(a)(8)(A)). Beyond its conclusory assertion that release of OMEGA v.1.4.59 would harm future agency deliberations, Wehrum Decl. ¶ 21, EPA does not substantiate its claim that providing public access to the core model will in fact foreseeably harm the quality of agency decision-making.

Moreover, as discussed earlier, EPA nowhere asserts that there *has* been any substantive, policy-driven revision to the OMEGA core model between the last public release (v.1.4.56 in July 2016) and the latest version (v.1.4.59, in place no later than April 2018). EPA speculates (Mem. 12) that releasing the v.1.4.59 core model would reveal deliberation by disclosing *whether* significant changes have been made, but Plaintiffs already have explained why that reasoning is flawed. *See supra*, page 7. If no substantive, policy-driven changes have in fact been made in the v.1.4.59 core model as compared to the most recent published version, disclosure of the v.1.4.59 core model cannot "foresee[ably] … harm an[y] interest" of EPA that is protected by Exemption 5. 5 U.S.C. § 552(a)(8)(A).

### 2. The executable package for the OMEGA core model is reasonably segregable from the source code.

Even if this Court were to determine that EPA has properly withheld some portions of the OMEGA v.1.4.59 core model, the agency still would need to disclose any reasonably segregable records that are not "memorandums or letters"; are not "deliberative"; or are not "predecisional." EPA asserts (Mem. 23) that it disclosed all reasonably segregated, non-exempt records, including "the OMEGA input files, pre-processors, and post-processors compatible with version 1.4.59," but excluding the "full" core model. Plaintiffs appreciate EPA's admission that many other elements of OMEGA could not be withheld, but the agency has failed to show why all core-model records must be withheld. Specifically, EPA does not distinguish between the uncompiled source code and the executable package for the OMEGA core model, both of which the agency is withholding.

EPA's brief and supporting declarations address only the source code. *See* Wehrum Decl. ¶ 2 (stating "the basis for withholding the source code"); Charmley Decl. ¶ 23 (wrongly equating OMEGA "Installation Files" requested by Plaintiffs with "source code"). But the source code must "be compiled into machine code before it can be executed by a computer." *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1289 n.2 (Fed. Cir. 2016). *See* Cooke Decl. ¶ 7. Once compiled, the executable package of the OMEGA core model can be installed and run by a user. *See id.* ¶¶ 7-8.

The underlying computer code of the executable package is unintelligible to humans, even programmers who wrote the source code. *See* Cooke Decl. ¶ 7. The executable package is thus a quintessential example of a *record* that is a non-deliberative *memorandum or letter*. *See supra*, pages 3-5. Because the executable package is reasonably segregable from the other records that EPA is withholding, this Court should order EPA to disclose the executable package even if the Court were to determine that Exemption 5 protects the source code for the OMEGA core model.

## II.    EXPEDITION OF THIS CASE IS WARRANTED.

Plaintiffs have shown (Mem. 24-25) "good cause" to expedite disposition of this case under the Civil Priorities Act, because they are asserting FOIA rights "in a factual context that indicates that a request for expedited consideration has merit." 28 U.S.C. § 1657(a). EPA does not dispute that it is on the verge of finalizing a rule with momentous public-health consequences, or that its rulemaking turns on analysis of the precise question that the withheld records are meant to inform, namely, the "period … necessary to permit development and application of [emissions-reduction] technology, giving appropriate consideration to the cost of compliance." 42 U.S.C. § 7521(a)(2). That Plaintiffs may "request that EPA reconsider any decision" after it issues, Def. Mem. 25, does not lessen their urgent need for disclosure of the records, because any reconsideration proceeding "shall not postpone the effectiveness" of this highly damaging rule, 42 U.S.C. § 7607(d)(7)(B).

EPA wrongly suggests (Mem. 24-25) that Congress impliedly amended the Civil Priorities Act in 1996 by adding to FOIA a provision requiring agencies to issue regulations "providing for expedited" *administrative* "processing of requests for records." 5 U.S.C. § 552(a)(6)(E)(i). There is no suggestion in the text or legislative history of that amendment that Congress meant to offer "guidance" to *courts* "concerning which FOIA matters deserve expedition." Def. Mem. 25 n.12. *See generally Nat'l Assn of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 664 n.8 (2007) (observing that a later-enacted statute is strongly presumed not to impliedly repeal an earlier one). The Court should decline EPA's invitation to transform a "liberally construed" standard for judicial expedition under the Civil Priorities Act, *Brennan Ctr. for Justice v. U.S. Dep't of State*, 300 F. Supp. 3d 540, 547 (S.D.N.Y. 2018) (quoting H.R. Rep. No. 985, 98th Cong., 2d Sess. 6 (1984)), into a "narrowly applied," Def. Mem. 24, standard for administrative expedition under FOIA. In any event, there is certainly an "urgency to inform the public concerning actual or alleged Federal

Government activity," 5 U.S.C. § 552(a)(6)(E)(v)(II), *i.e.*, EPA's effort to bury inconvenient facts

that do not support its proposal to drastically weaken air-pollution standards, *see* Pls. Mem. 10-11.

EPA does not and cannot allege that it would be prejudiced by the expedition of a judicial

decision. Plaintiffs are not asking the agency to expedite its own action; the agency already issued

its final decision on their FOIA request. Plaintiffs request only that *this Court* expedite disposition

of their motion for summary judgment. EPA has stipulated to a May 23, 2019, deadline for a reply

in support of its cross-motion, JSR at 2, and, upon that filing, this case will be ripe for disposition

with no further action required of the Executive Branch. The agency wants to delay disposition of

Plaintiffs' motion for the same reason that EPA delayed disposition of their FOIA request: to run

out the clock so that the public will not be able to hold the government to account for its actions.

But that is precisely the outcome that FOIA and the Civil Priorities Act were designed to avoid.

## CONCLUSION

This Court should grant Plaintiffs summary judgment; deny EPA summary judgment;

declare Exemption 5 inapplicable to the latest full version of the OMEGA model, including the

OMEGA v.1.4.59 core model; and order EPA to produce the model on or before June 17, 2019.

Dated: May 13, 2019                    Respectfully submitted,

                                       */s/Pete Huffman*
                                       Benjamin Longstreth
                                       Peter Huffman
                                       Natural Resources Defense Council
                                       1152 15th Street NW, Suite 300
                                       Washington, D.C. 20005
                                       (202) 289-2428
                                       blongstreth@nrdc.org
                                       phuffman@nrdc.org

                                       *Counsel for Natural Resources Defense Council*

/s/Matthew Littleton

Matthew Littleton
Donahue, Goldberg & Weaver, LLP
1008 Pennsylvania Ave. SE
Washington, D.C. 20003
(202) 683-6895
matt@donahuegoldberg.com

/s/Benjamin Levitan

Benjamin Levitan
Erin Murphy*
Environmental Defense Fund
1875 Connecticut Ave. NW, Suite 600
Washington, D.C. 20009
(202) 572-3500
blevitan@edf.org
emurphy@edf.org

*Counsel for Environmental Defense Fund*
* Admitted *pro hac vice.*